[Civ. No. 69090. Second Dist., Div. Four. May 23, 1985.]

F & P GROWERS ASSOCIATION, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

668

COUNSEL

Keith A. Hunsaker, Jr., James Weinstein and Seyfarth, Shaw, Fairweather & Geraldson for Petitioner.

Manuel M. Medeiros, Daniel G. Stone, Nancy C. Smith and Cathy Christian for Respondent.

Dianna Lyons, Daniel A. Garcia and Wendy Sones for Real Party in Interest.

OPINION

**KINGSLEY, J.**—Petitioner, F & P Growers Association (F&P), pursuant to section 1160.8 of the Agricultural Labor Relations Act (the ALRA), seeks review of the final decision and order of the Agricultural Labor Relations Board (sometimes called the Board) issued in *F & P Growers Association* (1983) 9 ALRB No. 28 which supplements the Board's earlier decision and order in *F & P Growers Association* (1983) 9 ALRB No. 22.

F & P is a nonprofit corporation located in Ventura. It harvests oranges and grapefruits for grower members. On July 10, 1978, by election, the United Farm Workers of America, AFL-CIO, (the UFW or the Union) was certified as the bargaining representative of the agricultural employees of F & P.

There were some negotiations between F & P's negotiator and the UFW's negotiator, but the negotiations were abandoned, and the UFW did not contact F & P for about a year and a half. Bill J. Winters, manager of F & P Growers, declared that there was no union presence in the orchards until September of 1980. UFW contacted F & P to resume negotiations in September 1980, and negotiations began between David Villarino of the UFW

and Mr. Gordon of F & P. UFW abandoned negotiations and F & P did not hear from UFW for another year and a half.

On July 16, 1981, UFW negotiator Arturo Mendoz sent a letter to F & P requesting resumption of negotiations. F & P refused, relying on precedent decided under the National Labor Relations Act (NLRA) and incorporating the precedent into California law by virtue of section 1148 of the NLRA. F & P asserted that it no longer had a duty to bargain because objective criteria revealed that a majority of employees in the bargaining unit no longer supported the UFW, and this was a defense for failure to bargain.

On January 26, 1982, the Union filed an unfair labor practice charge against F & P. The Union alleged that F & P had engaged in "surface bargaining" during the previous negotiations, and that now F & P had completely refused to bargain and had denied access to Union representatives.

The surface bargaining charge was dismissed and the Board issued its decision in *Nish Noroian Farms* (1982) 8 ALRB No. 25. In *Nish Noroian,* in dicta, the Board announced that the NLRA loss-of-majority defense to a refusal to bargain charge was not available to an employer in a case involving the ALRA.

The regional director alleged that F & P violated section 1153 subdivisions (a) and (e) of the ALRA by refusing to bargain with the UFW's union. The complaint requested an order that F & P make each employee whole for all economic losses resulting from a refusal to bargain.

F & P answered, stating that its refusal to bargain was the result of a good faith doubt, based on objective evidence, that the UFW no longer represented a majority of F & P's agricultural employees.

General counsel for ALRB moved for summary judgment. F & P opposed the motion for summary judgment setting forth facts in two declarations supporting F & P's belief that UFW no longer had majority support of the workers.

The administrative law judge concluded that F & P violated section 1153, subdivisions (a) and (e) of the ALRA.[1] The administrative law judge con-

---

[1] Labor Code section 1153, subdivisions (a) and (e) makes it an unfair labor practice "(a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152. [¶] "(e) To refuse to bargain collectively in good faith with labor organizations certified pursuant to the provisions of Chapter 5 (commencing with Section 1156) of this part."

cluded that neither the Union's actual loss of majority support nor a good faith belief that the Union no longer represented the majority was a defense to refusal to bargain. The administrative law judge granted the make whole remedy. The ALRB affirmed the administrative law judge's make whole remedy with respect to liability following the *Nish Noroian* decision. The Board found that after the *Nish Noroian* decision, the make whole remedy was proper, regardless of F & P's good faith belief, but that prior to the *Nish Noroian* decision, the make whole remedy should only apply if F & P in fact did not have a good faith belief that the Union represented a majority of employees.

The Board thus remanded the make whole remedy for the time period prior to April 15, 1983, for a factual determination of F & P's good faith, and the Board affirmed the make whole remedy for the period subsequent to *Nish Norian.* The request for make whole prior to April 15, 1983, was deleted and a final order was issued.

F & P challenges the Board's ruling that an employer's good faith doubt as to a union's loss of majority status is not a defense to an employer's refusal to bargain with a board-certified union, and F & P disputes the Board's ruling that F & P must make the employees whole for the losses they sustained as a result of a refusal to bargain, for the period of time after the *Nish Noroian* decision was handed down.

No decertification petition has been filed by the F & P employees, nor has a rival union filed for election.

Appellant argues that an agricultural employer may refuse to bargain with an incumbent union if he reasonably believes that the union has lost majority support or if the union has actually lost majority support. Appellant reasons that, under section 1148 of the ALRA,[2] the ALRB must follow applicable precedents as amended. Appellant relies upon the rule that, unless there is a textual difference or some other consideration relating only to the ALRA that makes the NLRB precedent inapplicable, the ALRB must follow NLRA precedent. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 412-413 [128 Cal.Rptr. 183, 546 P.2d 687].) Appellant seeks to follow the particular NLRA precedent which holds that an employer may rebut a presumption that an incumbent union continues to enjoy majority support, and, if union support is lacking, the employer's refusal to bargain is proper because it actually furthers the cause of employee democracy by

---

[2]Section 1148, Labor Code reads: "The board shall follow applicable precedents of the National Labor Relations Act, as amended."

overcoming the inertia which helps maintain the status quo. (See *N. L. R. B.* v. *Tahoe Nugget, Inc.* (9th Cir. 1978) 584 F.2d 293, 300, *cert. den.*, 442 U.S. 921 [61 L.Ed.2d 290, 99 S.Ct. 2847].)

## I

Thus, the first issue before this court is whether this particular NLRA precedent concerning the employer's good faith belief is "applicable," such that under section 1148 of the ALRA, the agricultural petitioner herein may assert its good faith belief as a defense for failure to bargain with the UFW.

First we note that there are other factual situations in which the NLRA precedents were held to be applicable to cases arising under the ALRA. For example, as a result of statutory similarities, the Board expressly approved and adopted the NLRA rule that a year after certification, there is a rebuttable presumption that a union continues to be supported by a majority of employees. (See *Kaplan's Fruit & Produce Co.* (1977) 3 ALRB No. 28; the Court of Appeal affirmed the ruling in *Montebello Rose Co.* v. *Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 29 [173 Cal.Rptr. 856].) Therefore, the ALRB has adopted the NLRB precedent that an employer's duty to bargain does not lapse after one year even in the absence of an extension. (*Kaplan's Fruit & Produce Co., supra,* 3 ALRB No. 28.)

Petitioner argues that since the Board has followed the NLRA precedent in the above situation, and other situations, it should have followed the NLRA precedents in regard to the "loss of majority" defense. Appellant charges the Board has followed the NLRB "rebuttable presumption" rule to obtain a desired result in *Kaplan's* case, but now refuses to follow the NLRB "loss of majority defense," because the Board ferrets out and follows only those NLRA precedents it wants to follow.

Thus, the argument posed by the petitioner is whether the ALRB could properly reject the particular NLRA precedent that the employer may withdraw recognition and refuse to bargain if a union in fact loses majority support or if the employer has a good faith reasonably grounded belief that the incumbent union no longer enjoys the support of a majority of employees in the bargaining unit, in view of the fact that the Board has followed other NLRB precedents.

The Agricultural Labor Relations Board is not required to follow one precedent from the NLRB simply because it has followed other precedents. The crucial question before the court is whether the particular NLRA

precedent is "applicable." (*Perry Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448 [150 Cal.Rptr. 495].)

The question before us then is whether the particular NLRA precedent discussed above is "applicable." If the particular precedent is applicable, then the Board erred in finding that the loss of majority defense is unavailable to F & P. Whether the Board has or has not followed *other* NLRA precedents is not determinative of whether it is required to follow this precedent.

Section 1148 does not define what it means by "applicable" precedents. But the meaning of the term has been discussed in the cases. In *Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392 (app. dism. 429 U.S. 802 [50 L.Ed.2d 163, 97 S.Ct. 33, 34]) the court noted that the Legislature intended the board to select and follow only those federal precedents which are relevant to the particular problems of labor relations on the California labor scene.

Also, the court in *Cadiz* v. *Agricultural Labor Relations Bd.* (1979) 92 Cal.App.3d 365, 374 [155 Cal.Rptr. 213] found the NLRB precedent with respect to decertification to be inapplicable to section 1156.7, since there is no federal statute comparable to the provision establishing a contract bar to elections and no federal statute authorizing an open period for filing decertification proceedings. The court in *Cadiz* quoted from *Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392, and also relied on the statement "[T]he board could fairly have inferred that the Legislature intended it to select and follow only those federal precedents which are relevant to the particular problems of the California agricultural scene."

Therefore, relying on language in *Tulare* and also *Cadiz,* and the standard set therein, the court will find the NLRA defense related to the employer's good faith belief as to loss of majority support to be applicable here, only if this NLRA precedent relates to the particular problems of the agricultural labor scene.[3]

The Board in *Nish Noroian, supra,* 8 ALRB No. 25 in dicta rejected the loss of majority defense on the ground that the particular precedent was "inapplicable." In *Nish Noroian,* the Board pointed to differences in the NLRA and ALRA, pointing out that under the ALRA an employer is not

---

[3]We are also mindful of the rule that the ALRB's interpretation of the act must be respected unless clearly erroneous. (*Montebello Rose Co.* v. *Agricultural Labor Relations Bd.,* *supra,* 119 Cal. 3d 1, 28.)

permitted to file an election petition, whereas under section 9(c)(1)(B) of the NLRA, 29 United States Code section 159 (c)(1)(B), an employer may file an election petition. Thus, the Board in *Nish Noroian* found the NLRA statute inapplicable, due to the differences in the two acts. The Board in *Nish Noroian* believed that the loss of majority support defense was not relevant to the particular problem of the California agricultural scene.

The Board argues that the NLRA precedent concerning good faith belief is inapplicable here, because the NLRA and the ALRA differ significantly with respect to employer participation in the representation procedure. The Board points to several significant differences under the two acts. First, the Board points out that the employer under the NLRA may voluntarily recognize and bargain with a labor union that has demonstrated its majority status by means other than an election. (See *NLRB* v. *Gissel Packing Co.* (1969) 395 U.S. 575 [23 L.Ed.2d 547, 89 S.Ct. 1918].) By contrast, under normal circumstances, the ALRA does not permit an employer to bargain with an organization that has not won an election. The ALRA only permits employees or labor unions to petition the Board to conduct an election or certification procedure (ALRA § 1156.3),[4] but under the NLRA

---

[4]Labor Code section 1156 provides that bargaining agents selected by the Agricultural Labor Relations Act's (ALRA or Act) [Labor Code, § 1140 et seq.] majoritarian secret ballot election provisions (Labor Code, § 1156.3) "shall be the exclusive representative of all the agricultural employees in [the bargaining] unit." Sections 1156.3, subdivisions (c) and (d) provide for Board certification of the chosen representative. Section 1156.3 of the Labor Code reads: "(a) A petition which is either signed by, or accompanied by authorization cards signed by a majority of the currently employed employees in the bargaining unit may be filed in accordance with such rules and regulations as may be prescribed by the board, by an agricultural employee or group of agricultural employees, or any individual or labor organization acting in their behalf alleging all the following: [¶] (1) That the number of agricultural employees currently employed by the employer named in the petition, as determined from his payroll immediately preceding the filing of the petition, is not less than 50 percent of his peak agricultural employment for the current calendar year. [¶] (2) That no valid election pursuant to this section has been conducted among the agricultural employees of the employer named in the petition within the 12 months immediately preceding the filing thereof. [¶] (3) That no labor organization is currently certified as the exclusive collective-bargaining representative of the agricultural employees of the employer named in the petition. [¶] (4) That the petition is not barred by an existing collective-bargaining agreement. [¶] Upon receipt of such a signed petition, the board shall immediately investigate such petition, and, if it has reasonable cause to believe that a bona fide question of representation exists, it shall direct a representation election by secret ballot to be held, upon due notice to all interested parties and within a maximum of seven days of the filing of the petition. If at the time the election petition is filed a majority of the employees in a bargaining unit are engaged in a strike, the board shall, with all due diligence, attempt to hold a secret ballot within 48 hours of the filing of such petition. The holding of elections under strike circumstances shall take precedence over the holding of other secret ballot elections. [¶] The board shall make available at any election under this chapter ballots printed in English and Spanish. The board may also make available at such election ballots printed in any other language as may be requested by an agricultural labor organization, or agricultural employee eligible to vote under this part. Every election ballot, except ballots in runoff elections where

(§ 9(c)(1)(B) 29 U.S.C. § 159(c)(1)(B)), the employer may petition for an election.

The ALRB also correctly points out that ALRA section 1156.7,[5] which deals with decertification during the term of a collective bargaining agree-

---

the choice is between labor organizations, shall provide the employee with the opportunity to vote against representation by a labor organization by providing an appropriate space designated 'No Labor Organizations.' [¶] (b) Any other labor organization shall be qualified to appear on the ballot if it presents authorization cards signed by at least 20 percent of the employees in the bargaining unit at least 24 hours prior to the election. [¶] (c) Within five days after an election, any person may file with the board a signed petition asserting that allegations made in the petition filed pursuant to subdivision (a) were incorrect, that the board improperly determined the geographical scope of the bargaining unit, or objecting to the conduct of the election or conduct affecting the results of the election. [¶] Upon receipt of a petition under this subdivision, the board, upon due notice, shall conduct a hearing to determine whether the election shall be certified. Such hearing may be conducted by an officer or employee of a regional office of the board. He shall make no recommendations with respect thereto. If the board finds, on the record of such hearing, that any of the assertions made in the petition filed pursuant to this subdivision are correct, or that the election was not conducted properly, or misconduct affecting the results of the election occurred, the board may refuse to certify the election. Unless the board determines that there are sufficient grounds to refuse to do so, it shall certify the election. [¶] (d) If no petition is filed pursuant to subdivision (c) within five days of the election the board shall certify the election. [¶] (e) The board shall decertify a labor organization if the United States Equal Employment Opportunity Commission has found, pursuant to Section 2000(e)(5) of Title 42 of the United States Code, that the labor organization engaged in discrimination on the basis of race, color, national origin, religion, sex or any other arbitrary or invidious classification in violation of Subchapter VI of Chapter 21 of Title 42 of the United States Code during the period of such labor organization's present certification."

[5]Section 1156.7 of the Labor Code reads: "(a) No collective-bargaining agreement executed prior to the effective date of this chapter shall bar a petition for an election. (b) A collective-bargaining agreement executed by an employer and a labor organization certified as the exclusive bargaining representative of his employees pursuant to this chapter shall be a bar to a petition for an election among such employees for the term of the agreement, but in any event such bar shall not exceed three years, provided that both the following conditions are met: [¶] (1) The agreement is in writing and executed by all parties thereto. (2) It incorporates the substantive terms and conditions of employment of such employees. [¶] (c) Upon the filing with the board by an employee or group of employees of a petition signed by 30 percent or more of the agricultural employees in a bargaining unit represented by a certified labor organization which is a party to a valid collective-bargaining agreement, requesting that such labor organization be decertified, the board shall conduct an election by secret ballot pursuant to the applicable provisions of this chapter, and shall certify the results to such labor organization and employer. [¶] However, such a petition shall not be deemed timely unless it is filed during the year preceding the expiration of a collective-bargaining agreement which would otherwise bar the holding of an election, and when the number of agricultural employees is not less than 50 percent of the employer's peak agricultural employment for the current calendar year. [¶] (d) Upon the filing with the board of a signed petition by an agricultural employee or group of agricultural employees, or any individual or labor organization acting in their behalf, accompanied by authorization cards signed by a majority of the employees in an appropriate bargaining unit, and alleging all the conditions of paragraphs (1), (2), and (3), the board shall immediately investigate such petition and, if it has reasonable cause to believe that a bona fide question of representation exists, it shall direct an election by secret ballot pursuant to the applicable provisions of this

ment, permits only employees or labor organizations to decertify a union by petition and election procedures.

The Board argues that since only employees and unions may file certification and decertification petitions under the ALRA, it follows that the Legislature intended that the agricultural employers have no control or influence over the selection or deselection of a union. From this the Board reasoned that an employer remains obligated to bargain with a certified union until the employees decertified the union or elect a rival union, regardless of the employer's good faith belief.

■ We agree that these differences in the NLRA and the ALRA, with respect to employer participation in the certification and decertification petitions, show a purpose on the part of the Legislature to prohibit the employer from being an active participant in determining which union it shall bargain with in cases arising under the ALRA.[6]

We therefore agree with the Board and the Union that the NLRA precedent is inapplicable here because of California's legislative purpose and because of the differences in the two acts. While it does not follow inexorably that the agricultural employer's good faith belief is not a defense for refusal to bargain just because the Legislature prevented an agricultural employer from electing a union or from filing a decertification petition, nor is such a conclusion demanded by pure syllogistic reasoning, it does appear that the Legislature's purpose in enacting the ALRA was to limit the employer's influence in determining whether or not it shall bargain with a particular union. Therefore, to permit an agricultural employer to be able to rely on its good faith belief in order to avoid bargaining with an employee

---

chapter. [¶] (1) That the number of agricultural employees currently employed by the employer named in the petition, as determined from his payroll immediately preceding the filing of the petition, is not less than 50 percent of his peak agricultural employment for the current calendar year. [¶] (2) That no valid election pursuant to this section has been conducted among the agricultural employees of the employer named in the petition within the 12 months immediately preceding the filing thereof. [¶] (3) That a labor organization, certified for an appropriate unit, has a collective-bargaining agreement with the employer which would otherwise bar the holding of an election and that this agreement will expire within the next 12 months."

[6]Nothing in *Carian* v. *Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654 [205 Cal.Rptr. 657, 685 P.2d 701] negates what we have said here. In fact the *Carian* court relied on language in *Agricultural Labor Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d 392 that the Legislature intended the Board to select and follow only those procedures applicable to the California agricultural scene. The *Carian* court stated that NLRA 29 United States Code section 151 et seq. provides useful guidelines as to the general principles governing Labor Code section 1153, subdivision (a), but the *Carian* court also said that the ALRB cannot be limited to those remedies which the NLRB chooses to impose in quite a different context. (36 Cal.3d at pp. 669, 670.)

chosen agricultural union, indirectly would give the employer influence over those matters in which the Legislature clearly appears to have removed employer influence. This court will not permit the agricultural employer to do indirectly, by relying on the NLRA loss of majority support defense, what the Legislature has clearly shown it does not intend the employer to do directly.

Our conclusion is consistent with the court's reasoning in *Montebello Rose Co.* v. *Agricultural Labor Relations Bd.*, *supra*, 119 Cal.App.3d 1, 28. There the court recognized that section 1156.3 allowed employees who were not covered by a collective bargaining agreement (and whose union was not "currently certified" within the meaning of section 1156.6) to petition for an election. Again the Legislature had shown its purpose was to provide employees, and not employers, a method for changing unions.

Further, we agree with the Board that the California agricultural scene differs greatly from other seasonal industries which come under the jurisdiction of the NLRB. Although some industries under the NLRB are also seasonal and have a rapid turnover of employees, the turnover in the agricultural industry is more extreme.[7] Where there is such a rapid turnover of agricultural employees and many of these temporary employees are also alien workers, who do not speak the English language, the workers may be especially unable to bargain with the employer, without the assistance of a union, and there is all the more reason for the Legislature to decide to remove the employer from any peripheral participation in deciding whether to bargain with a particular union. To allow the employer to rely on the "loss of majority" defense would permit the employer in effect to act as though the union were in fact decertified, based on the employer's reasonable good faith belief, even though under the ALRA it is clear that the employer may not initiate certification or decertification proceedings. Applying the NLRA defense would fail to respond to the particular needs of the California agricultural scene.[8]

Petitioner argues that the legislative purpose in cases arising under the ALRA was merely to prevent "sweetheart contracts" with unions, and since

[7]Martin & Mines, *Alien Workers and Agriculture: The Need For Policy Linkage* (1983) 1 Yale L. & Policy Rev. 255. As many as 200 people may be hired in one month to maintain a 20-person harvest group.

[8]The seasonal nature of California agriculture has been recognized, and a large enough number of employees are on the labor scene, such that a union may file for an election only during peak seasons. (See Levy, *The Agricultural Labor Relations Act of 1975—La Esperanza de California Para El Futuro* (1975) 15 Santa Clara Law. 783, 300, fn. 16.) These differences in California agricultural labor relations also promote our decision that the NLRB's precedent on the employer's good faith belief is not applicable under the ALRA.

the petitioner herein was not attempting to put in a "sweetheart union," the NLRB precedent was applicable.

Even though section 1153, subdivision (f) was adopted in part for the purpose of prohibiting an employer from entering into a "sweetheart" arrangement (*Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 859 [176 Cal.Rptr. 753, 633 P.2d 949]), this purpose is consistent with, and in harmony with, the Legislature's other purpose related to keeping employers out of the process of choosing a union. Both purposes relate to the legislative policy that the unions be chosen solely by the employees and not by the employers. Therefore, our holding rejecting the loss of majority defense is in harmony with the Legislature's purpose concerning "sweetheart" contracts.

F & P argues that, because the employees are seasonal employees and are often illiterate, they may not effectively be able to decertify a union, and the loss-of-majority defense actually protects the employees from being represented by a union not of the present employees' choice. The clear purpose of the Legislature is to preclude the employer from active participation in choosing or decertifying a union, and this certainly overrides any paternalistic interest of the employer that the employees be represented by a union of the present employees' own choice.

The legislative history is also consistent with our holding. ■ Declarations of a legislator are admissible as part of legislative history for whatever help it may be. (*Cadiz* v. *Agricultural Labor Relations Bd.*, *supra*, 92 Cal.App.3d 365 [155 Cal.Rptr. 213].) An examination of the transcripts of the public hearing of the Senate Industrial Relations Committees of the California State Legislature, Senate Bill No. 1, 1975 Third Extraordinary Session Relating to Farm Labor Relations, reveals that the legislators discussed the issue of whether the employees, rather than the employers, should chose the bargaining agent.[9]

Therefore, we hold the particular NLRA precedent herein inapplicable and the agricultural employer may not raise a "good faith doubt of majority support."

---

[9]The senators discussed whether employers had a right to trigger an election in the agricultural setting. Senator Dunlop opposed a motion permitting an employer to trigger an election. Senator Dunlop reasoned that in the agricultural setting, only the employee should choose a collective bargaining agent, since the reasons the employer may trigger an election under the NLRA do not exist in an agricultural setting. The motion permitting the employer to trigger an election did not pass.

## II

F & P argues that the Board abused its discretion in imposing the make whole remedy on the employer, from the period of time beginning with the date of the *Nish Noroian* decision. F & P argues that the make whole relief is discretionary, and the *Nish Noroian* decision does not negate the discretionary nature of make whole relief. The Board and Union argue that since the *Nish Noroian* decision held that the employer's good faith, reasonable belief that the Union did not represent a majority of the employees, was not a defense for the employer's refusal to bargain with the Union, the employer should have realized from that time on that it was required to bargain with the Union, regardless of the employer's good faith belief. The Board and Union also argue that, from that time on, failure to bargain with the Union warranted the imposition of the make whole remedy, since the employer knew it could not rely on its belief as a failure to bargain.

We agree with the employer that the make whole remedy is not automatic or a per se remedy even after the *Nish Noroian* decision. The language of Labor Code section 1160.3, empowering the Board to grant the make whole remedy, reads in part as follows: "The testimony taken by such member, agent, or agency, or the board in such hearing shall be reduced to writing and filed with the board. Thereafter, in its discretion, the board, upon notice, may take further testimony or hear argument. If, upon the preponderance of the testimony taken, the board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, the board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair practice, to take affirmative action, including reinstatement of employees with or without backpay, and making employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain, and to provide such other relief as will effectuate the policies of this part. When an order directs reinstatement of an employee, backpay may be required of the employer or labor organization, as the case may be, responsible for the discrimination suffered by him. Such order may further require such person to make reports from time to time showing the extent to which it has complied with the order. . . ."

The language of the empowering statute clearly indicates that the employer is correct in its assertion that the remedy of make whole does not apply per se or necessarily from an unfair labor practice, and we see no reason to depart from the rule as declared in the statute. The words in 1160.3 granting the Board the power to order make whole relief are words

which indicate that the imposition of the remedy is discretionary. Specifically, the Board is granted the power to order make whole relief "*when* the board deems such relief *appropriate.*" (Italics added.)

The statutory language quoted above indicates that "the board must deem the relief appropriate" prior to the imposition of make whole relief by the Board. It is apparent from the language of the statute, that make whole relief will not necessarily follow from an unfair labor practice because there may be times when the Board may deem the make whole relief "inappropriate." We conclude that under the language of the statute the Board must examine the particular facts or circumstances of each case to determine "appropriateness" of the make whole remedy. ■ A cardinal rule of construction is that a statutory construction is to be avoided that will make some words surplusage, and significance should be given to every word, phrase and sentence. (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 37 [160 Cal.Rptr. 710, 603 P.2d 1306].) ■ If we are to give significance to the statutory phrase related to deeming the relief "appropriate," and if we are to avoid a construction that would relegate those words as surplusage, we must give a statutory construction to section 1160.3 that construes the make whole remedy as discretionary and not per se.

It follows from our construction that regardless of what petitioner employer should or should not have realized after the *Nish Noroian* decision, the remedy must be "appropriate" under the particular circumstances of the case.

F & P argues that in *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.*, *supra,* 26 Cal.3d 1, the Supreme Court rejected the Board's automatic practice of applying make whole remedy as relief in cases involving technical refusal to bargain, and this ruling applies to the case at bar. ■ ■ ■ ■ The Board responds that the case before this court does not in any sense involve a technical refusal to bargain[10] and that *J. R. Norton* does not apply. The *Norton* court held that, where the employer refuses to bargain, in order to get judicial review, because the employer can not directly obtain judicial review of a board's decision to certify a union, make whole relief should not be granted per se.[11]

---

[10]The courts had earlier held that because there is no judicial review of a certification decision (*Nishikawa Farms, Inc.* v. *Mahony* (1977) 66 Cal.App.3d 781 [136 Cal.Rptr. 233]), a refusal to bargain is the only means of achieving judicial review where an employer doubts the validity of the election certification. The term "technical refusal to bargain" refers to the employer's seeking judicial review by refusing to bargain with the union. (*Boire* v. *Greyhound Corp.* (1964) 376 U.S. 473 [11 L.Ed.2d 849, 84 S.Ct. 894].)

[11]See also discussion of *J. R. Norton* in *Sandrini Brothers* v. *Agricultural Labor Relations Bd.* (1984) 156 Cal.App.3d 878, 886 [203 Cal.Rptr. 304].

Although the case before us does not involve a "technical refusal" to bargain, and the *Norton* decision cannot be considered as specifically compelling its particular result in the different case now before us, *Norton* is nevertheless instructive and consistent with our decision that make whole relief does not follow per se. *Norton* dealt with an employer's good faith doubt as to an election and certification. There was no election and certification at issue here; also there was a technical refusal to bargain in *Norton* and not here. However, in both *Norton* and the instant case there is a good faith doubt that the union properly represented the employees. *Norton* is instructive here in that *Norton* did involve a case where the Board refused to apply make whole relief per se where the employer held a good faith belief that the certified union did not represent the employees. Thus, *Norton* involved a case where the make whole remedy was not applied automatically, where the employer acted in good faith in its failure to bargain with the union and therefore that case is consistent with our view that the make whole remedy does not apply automatically or per se to all cases arising after *Nish Noroian*.

It was argued that since the legislative purpose in section 1140 et seq. was to keep the employer out of the certification and decertification process, when the employer attempts to involve itself in indirect attempts at decertification, even where there is employer good faith, make whole should apply. However, it does not follow either from the language of the statute or from the legislative purpose, that make whole relief is available in every case where the employer has failed to bargain without a defense. In *Norton, supra,* 26 Cal.3d 1, 39, the court said that they would examine the totality of the employer's conduct to see if the employer just went through the motions of contesting election results as an elaborate pretense to avoid bargaining, or whether it litigated in reasonable good faith that the union would not have been selected by the employees as their bargaining unit. In the case at bench, even though the employer may have had no right to be involved in deciding whether it would or would not bargain with the certified union, the Board still was required to examine the employer's conduct for particular facts and circumstances to see if the make whole remedy was appropriate. The fact that we now hold that the employer was required to bargain with the Union regardless of its good faith belief does not negate the discretionary nature of the make whole relief under the statute. ■
Per se make whole relief does not inexorably follow where the employer refuses to bargain, where the employer has a good faith belief that the Union does not represent a majority of employees. Even though that belief is no defense for failure to bargain, the language of the statute is clear that the Board issue the make whole relief only when it "deems" the relief appropriate.

In the case at bench the Board did find that after *Nish Noroian,* the make whole remedy should be applied. However, upon examination of the Board's decision, it is apparent that the Board did not apply this remedy per se or automatically. The Board said, "Cognizant, however, of our duty under section 1160.3 to exercise discretion in the imposition of the make whole remedy, we consider on a case-by-case basis the extent to which the public interest in the employer's position weighs against the harm done to the employees by its refusal to bargain. Unless litigation of the employer's position furthers the policies and purposes of the act, the employer, not the employees, should ultimately bear the financial risk of its choice to litigate rather than bargain. Make whole, after all, is not a penalty; it merely puts the parties and the employees in the economic positions that they presumably would have been in if the employer had not unlawfully refused to bargain."

Since the Board in the instant case did in fact examine the facts and circumstances of the particular case, and did not apply the make whole remedy per se or automatically, but applied it only after it exercised discretion and deemed that relief appropriate, the order herein was not an abuse of discretion. The Board must examine the facts and equities of each "particular" case before imposing make whole relief (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1, 37, 38) and this the Board did do.

The language of the Board's decision shows that they knew they had to examine each case individually, and the language of their decision indicates that they examined the case on a case-by-case basis. The Board used its own standards in determining appropriateness of the remedy in this particular case, and this they were entitled to do.

The order under review is affirmed.

Woods, P. J., and Arguelles, J., concurred.

Petitioner's application for review by the Supreme Court was denied August 29, 1985. Bird, C. J., did not participate therein. Lucas, J., was of the opinion that the application should be granted.