Filed 8/7/17 opinion on transfer from Supreme Court

## CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| ARNAUDO BROTHERS, L.P. et al., | F072420 |
| Petitioners, | |
| v. | (41 ALRB No. 3 & 41 ALRB No. 6) |
| AGRICULTURAL LABOR RELATIONS BOARD, | **OPINION** |
| Respondent; | |
| UNITED FARM WORKERS OF AMERICA, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING; petition for writ of review.

Charley M. Stoll, Rachelle O. Tejada and Anne W. Nilsen for Petitioners.

J. Antonio Barbosa, Paul M. Starkey and Todd M. Ratshin for Respondent.

Martinez Aguilasocho & Lynch and Mario G. Martinez for Real Party in Interest.

-ooOoo-

This writ proceeding addresses decisions by the Agricultural Labor Relations Board (Board) that an agricultural employer committed unfair labor practices by refusing to bargain with, and provide information to, the United Farm Workers of America (Union). The employer's defense was that in the early 1980's, the Union expressly disclaimed any interest in representing the bargaining unit -- a disclaimer reinforced by the Union's 30 years of inactivity. The Board rejected the employer's disclaimer defense

to the failure to bargain charge, because the purported disclaimer was not clear and unequivocal. The Board also awarded make whole relief based on the determination that the employer's litigation of the disclaimer issue did not further the policies and purpose of the Agricultural Labor Relations Act of 1975 (Lab. Code, §§ 1140-1166.3).[1] The employer contends the Board erred in rejecting its disclaimer defense and in concluding make whole relief was appropriate.

Our conclusions about the purported disclaimer of interest are limited to situations where disclaimer is raised as a defense to an unfair labor practices charge based on the failure to bargain. In that limited context, the Board correctly identified and applied the rules that define when a certified union has made a disclaimer of interest in representing the bargaining unit. The Board did not err in determining (1) the statement by the Union representative that "we're through with you" (if made) was not a clear and unequivocal disclaimer of interest and (2) subsequent conduct consistent with a disclaimer could not render the equivocal disclaimer effective. Thus, the Board did not err when it rejected the employer's disclaimer defense to the charge that employer failed to bargain with the Union.

In contrast, we conclude the Board's awarding of make whole relief was based on an erroneous determination that the litigation of the employer's position relating to the disclaimer defense did not further the policies and purposes of the Agricultural Labor Relations Act. The Board failed to consider how the Union's 30 years of inactivity and employee turnover is related to the current employees' right to freedom of association, which includes the right to refrain from collectively bargaining and the right to a representative "of their own choosing." (§§ 1140.2, 1152.) We conclude the public interest was furthered by the litigation of the disclaimer issue and, therefore, make whole relief was not "appropriate" for purposes of section 1160.3.

---

[1] All unlabeled statutory references are to the Labor Code.

We therefore reverse only the part of the Board's decisions awarding make whole relief.

## FACTS

*Parties*

Arnaudo Bros., L.P., a California limited partnership, and Arnaudo Bros., Inc., a California corporation, are the petitioners in this writ proceeding and were the respondents named in case No. 2012-CE-030-VIS before the Board. Steve Arnaudo, Leo Arnaudo and Greg Arnaudo are partners in Arnaudo Bros., L.P. The entities grow, harvest and pack asparagus and grow cannery tomatoes and alfalfa on approximately 6,000 acres of land near Tracy, California. They directly hire their agricultural employees, which one estimate places at approximately 130 to 150 workers at the seasonal peak. During the proceedings before the Board, the partnership and the corporation stipulated they would be jointly liable for any statutory violations. Consequently, we refer to the partnership and the corporation collectively as "Grower."

The Union is a labor organization within the meaning of section 1140.4, subdivision (f) of the Agricultural Labor Relations Act. On January 14, 1977, the Union was certified by the Board as the exclusive bargaining representative of Grower's agricultural workers in San Joaquin County.

*Initial Bargaining*

After the election, five years of negotiations between Grower and the Union failed to result in a collective bargaining agreement. Contact between Grower and the Union ceased in late 1981 or the first half of 1982. Exactly what happened in the last few contacts between Grower and the Union in the early 1980's is uncertain. The uncertainty about how the negotiating process ended was not resolved by a finder of fact, which assumed certain testimony presented by Grower was accurate.

3.

*2012 Renewal of Bargaining*

On August 7, 2012, after at least 30 years of silence, the Union sent Grower a letter seeking to renew negotiations on a collective bargaining agreement. The letter also requested information, including (1) separate employee lists for the 2011 and 2012 seasons; (2) maps of the properties used in Grower's operations; (3) the names and titles of Grower's representatives; (4) the name and license number of any farm labor contract used by Grower; (5) Grower's agricultural products; (6) the daily and yearly hours worked by employees; (7) a summary of employee benefits and wages in 2010, 2011 and 2012; and (8) copies of current employee manuals and policies.

On August 27, 2012, the Union repeated its written request, informing Grower it would file a charge with the Board for refusals to bargain and furnish information if Grower did not respond within five days. Grower did not respond to either request within the time stated by the Union.

*Union Files Unfair Labor Practice Charges*

On September 10, 2012, the Union filed the charge that initiated the proceedings now before this court. The charge alleged Grower refused to provide information requested by the Union. The Board assigned the matter No. 2012-CE-030-VIS.

The Union designated Guadalupe Larios to negotiate with Grower and its attorney, Robert K. Carrol. In response to Larios's September 24, 2012, email, Carrol did not respond directly to the dates proposed for the recommencement of bargaining, but stated he would contact her after returning from South America on October 9, 2012, to discuss preliminary questions such as (1) what happened at the bargaining table between 1977 and 1982 before the Union walked away, (2) whether the bargaining unit had changed dramatically in the past 30 years, (3) whom exactly the Union believed it was representing, and (4) whether the Union had comparable contracts it would send him for review.

The parties continued to exchange communications during the following months. For example, on November 13, 2012, Grower provided the Union with a spreadsheet that included some of the requested information for approximately 200 employees who worked for Grower through March until October of 2012. The Union determined that over 100 of the addresses given were inaccurate.

During the months the Union and Grower's attorney exchanged communications, Board's regional office investigated the charge filed by the Union. That investigation included serving a subpoena requesting some of the same information sought by the Union. During January 2013, Grower provided some information to the Union and Board. In a January 22, 2013, email to Larios, Carrol suggested that they discuss bargaining dates starting after Grower's employees returned to work "in a few more weeks."

In early February 2013, the Union filed a declaration with the Board requesting mandatory mediation and conciliation pursuant to section 1164.[2] Grower filed an answer to the declaration asserting the parties had made repeated attempts to find mutually agreeable dates to commence bargaining and the Union had unilaterally abandoned that effort. On February 13, 2013, the Board issued an order directing the parties to proceed with mandatory mediation. Due to scheduling conflicts among the parties, their counsel and the mediator, the first session of mandatory mediation was set for May 24, 2013.

---

[2]     In 2002, the Legislature added a new chapter to the Agricultural Labor Relations Act that created a binding procedure called mandatory mediation and conciliation. (See see Lab. Code, §§ 1164-1164.13; Cal. Code Regs., tit. 8, §§ 20400-20408 [regulations governing mandatory mediation].) The mandatory mediation chapter does not explicitly address the consequences of a union's prolonged inactivity.

We refer to the binding procedure as "mandatory mediation," rather than using the acronym "MMC" adopted by the parties. (See Herrmann, The Curmudgeon's Guide to Practicing Law (ABA 2006) 6 [clear writing "avoid[s] alphabet soup"].)

In April 2013, a field worker and employee of Grower circulated a document among other employees of Grower stating they did not want the Union's services or any other union. The document was signed by 86 employees.

*The Unfair Labor Practice Complaint*

On May 9, 2013, an unfair labor practice complaint, based on the September 2012 charges, was issued by the Board's general counsel. The complaint alleged Grower had committed unfair labor practices by (1) interfering with employees' exercise of their statutory rights, (2) refusing to provide complete and accurate bargaining information to the Union and (3) refusing to make itself available at reasonable times for the purpose of negotiating with the Union. Grower's answer stated negotiations had not been held due to scheduling conflicts on both sides and, moreover, a mandatory mediation had been set for May 24, 2013, by the parties and the mediator. The answer also asserted the affirmative defenses of waiver[3], estoppel, laches and the statute of limitations. The hearing on the unfair labor practices charges was set for July 25, 2013.

*Decertification Petition*

On May 24, 2013, a petition to decertify the Union was filed by the employee who earlier circulated the document expressing the desire to leave the Union. The same day, the acting regional director issued a notice of decision to block the decertification election.[4] About a week later, the employee requested the Board review the acting regional director's decision to block the election. Grower also filed a request for review.

On June 13, 2013, the Board issued *In re Arnaudo Brothers, LP* (2013) 39 ALRB No. 9, affirming the acting regional director's decision to block the election requested in the decertification petition. Although the Board determined the acting regional director

---

[3]     Based on the record before us, we assume that the defense of disclaimer of interest is a variant of the defense of waiver.

[4]     May 24, 2013, also was the date the parties and the mediator first met for mandatory mediation.

committed procedural error by failing to investigate and decide whether the decertification petition was valid before deciding whether to block the election, it ultimately concluded that the pending unfair labor practice complaint against Grower, alleging refusal to provide information and bargain, was sufficient to block the decertification election.

*Unfair Labor Practice Proceedings*

On June 21, 2013, the Board's general counsel issued a first amended complaint that added Arnaudo Bros., Inc. as a respondent and alleged the corporation and Arnaudo Bros., L.P. were alter egos of one another. The amended complaint asserted the same three causes of action as the original complaint. The alter ego issue was resolved when the partnership and corporation stipulated to joint liability for any statutory violations.

On July 22, 2013, three days before the scheduled unfair labor practice hearing, Grower filed a motion for summary judgment, supported by declarations from Steve Arnaudo and Carrol. The motion asserted the cause of action alleging Grower had unlawfully delayed bargaining was "preposterous" on its face and failed as a matter of law. It also asserted the other two causes of action alleging a failure to produce documents and information could not be established because Grower provided all the information necessary for the Union to bargain intelligently.

The next day, the administrative law judge issued a one-sentence order denying the motion for summary judgment. At the subsequent hearing, the administrative law judge explained that the facts upon which the motion was based had not been established as true and the Board's general counsel was entitled to an opportunity to present evidence relating to those factual assertions.

*Initial Decisions*

On September 26, 2013, after two days of testimony on the unfair labor practice complaint and the filing of posthearing briefs, the administrative law judge issued his

decision. The decision stated Grower had committed unfair labor practices by (1) refusing to agree to meet with the Union within a reasonable time after the Union requested bargaining and (2) failing to respond adequately to the Union's information request.

Grower filed a dozen exceptions to the decision. Among other things, Grower argued the administrative law judge's refusal to allow evidence pertaining to the Union's three-decade absence denied Grower an opportunity to present the defense of the Union's disclaimer of interest.

On April 4, 2014, the Board issued its decision in *Arnaudo Brothers, LP and Arnaudo Brothers, Inc.* (2014) 40 ALRB No. 3 (*Arnaudo I*). The decision addressed abandonment and disclaimer of interest, concluded disclaimer of interest was one way a union might forfeit its certification, and remanded to the administrative law judge with an order "to take evidence on the sole issue of whether a disclaimer of interest occurred."

*Supplemental Hearing and Decision*

The administrative law judge held hearings relating to the alleged disclaimer of interest on October 14, 2014, and March 6, 2015. Steve Arnaudo testified as to his recollection of what was said at the last bargaining session with the Union, which he thought occurred on October 21, 1981. According to Arnaudo, the union negotiator asked him, "You don't like unions, do you?" Arnaudo responded, "Yeah, I'm okay with unions. I just don't like, particularly, your union … I have no problem with unions, except you." The Union negotiator replied, "We don't like you either. We're through with you." Arnaudo then told him, "Well, great, so I'm over with you.'"

Dante Nomellini, the Grower's attorney at the last bargaining session, testified that he did not hear or recall any such statements. Luciano Crespo, the bargaining representative for the Union, testified he never spoke with Arnaudo, and did not make any such statements to anyone. He explained that after a cursory opening statement, he handed Nomellini a written proposal, which Nomellini took and said he would need time

8.

to review it with his client and would respond later. Nothing else was said and Nomellini and Arnaudo left the meeting. Crespo testified that he immediately returned to his office and wrote a letter to Nomellini, essentially thanking him for the meeting and ending with something like: "I'll await your response." No response was received.

On April 29, 2015, the administrative law judge issued his supplemental decision addressing (1) the Union's alleged disclaimer of interest and (2) make whole relief. As to the disclaimer of interest, the test applied was whether the Union's conduct was clear, unequivocal, not in bad faith, and not inconsistent with its subsequent conduct. Although the administrative law judge stated: "The testimony, and lack thereof, presents several potential credibility analyses," he sidestepped making credibility findings as to whether the exchange described by Steve Arnaudo with the Union representative actually took place by deciding the statements recounted by Steve Arnaudo, if made, were not a clear and unambiguous disclaimer of interest in representing Grower's employees. This approach also allowed the administrative law judge to avoid deciding whether Crespo wrote or called Nomellini after the last session to request further negotiations. As to the Union's subsequent hiatus from bargaining, the administrative law judge stated:

> "Board, in its Decision herein, stated that mere inactivity does not amount to a disclaimer of representative status. The undersigned does not believe that such inactivity can be used to clari[f]y an otherwise ambiguous and equivocal statement, so as to create a disclaimer. Rather, evidence must be produced showing conduct, in itself, which clearly and unequivocally establishes such a disclaimer. **Then**, evidence of subsequent conduct inconsistent with the disclaimer may be considered to show it was unintentional or made in bad faith." (Original boldface, fn. omitted.)

Based on his analysis of the statement presumably made by the Union representative, and his view of the legal principles governing the role of subsequent conduct, the administrative law judge rejected the disclaimer defense and reiterated his conclusion that Grower's conduct violated subdivisions (a) and (e) of section 1153.

9.

The remedy formulated by the administrative law judge directed Grower to cease and desist from failing to provide information and from failing to bargain. He also directed Grower to make information available to the Union and to make the bargaining unit members whole for all losses in wages and fringe benefits they reasonably suffered as the result of Grower's refusal to bargain, for the period of September 27, 2012, to May 24, 2013 (i.e., the date of the first mandatory mediation session), plus interest.

Grower and the Union filed exceptions to the administrative law judge's supplemental decision. Grower contended the Union's negotiator clearly disclaimed any interest in representing Grower's employees and, alternatively, the inactivity of the Union could be used to clarify any ambiguity in statements disclaiming the Union's interest. The Union contended Grower had prolonged the mandatory mediation process for two years and, therefore, the make whole period should end on the date the parties implemented the contract imposed pursuant to the mandatory mediation process.

*Board's Second Decision*

On September 10, 2015, the Board issued *Arnaudo Brothers, LP and Arnaudo Brothers, Inc.* (2015) 41 ALRB No. 6 (*Arnaudo II*) in which a majority affirmed the administrative law judge's ruling, findings and conclusions in full. The concurring and dissenting opinion of one Board member agreed with rejecting the claim that the Union disclaimed interest in representing the bargaining unit, agreed with awarding a make whole remedy, but provided additional grounds for why the make whole remedy was appropriate.

The Board's decision adopted the recommended order and directed Grower to take the actions set forth in that order. The majority decision in *Arnaudo II* did not contain any independent analysis or findings relating to (1) the final conversation between representatives of the Union and Grower in 1981 or 1982 or (2) the make whole remedy.

In September 2015, Grower filed a petition for review of the Board's decisions in *Arnaudo I* and *Arnaudo II* with this court. In October 2015, after a certified record was

filed by the Board, we set a briefing schedule. The briefing was completed in July 2016, and we issued a writ of review.

## DISCUSSION

I.     BASIC PRINCIPLES

A.     <u>Jurisdiction of Court of Appeal</u>

Section 1160.8 provides in pertinent part:  "Any person aggrieved by the final order of the board granting or denying in whole or in part the relief sought may obtain a review of such order in the court of appeal … by filing in such court a written petition requesting that the order of the board be modified or set aside."  The grounds for judicial review are limited to (1) whether substantial evidence supports the Board's decision, (2) whether an error of law was made, and (3) whether the decision was procedurally sound. (*Phillip D. Bertelsen, Inc. v. Agricultural Labor Relations Bd.* (1992) 2 Cal.App.4th 506, 519.)  To remedy these errors, the court may "make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part, the order of the board."  (§ 1160.8.)

B.     <u>Standards of Review</u>

*1.     Questions of Fact*

The Board's findings on question of fact are upheld "if supported by substantial evidence on the record considered as a whole."  (§ 1160.8.)  When reviewing the sufficiency of the evidence to support factual findings, our power as a court of review is limited to whether substantial evidence supports the finding; we have no power to judge the effect or value of the evidence, to weigh the evidence, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn from the evidence. (*Montebello Rose Co. v. Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 21 (*Montebello Rose*).)  Consequently, where substantial evidence supports the Board's factual findings, "we are not concerned that contrary findings may seem to us equally

11.

reasonable, or even more so." (*Rivcom Corp. v. Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 756-757.)

Witness credibility is a matter particularly for the trier of fact. (*Harry Carian Sales v. Agricultural Labor Relations Bd.* (1985) 39 Cal.3d 209, 220; *Montebello Rose*, *supra*, 119 Cal.App.3d at p. 20.) As a result, this court will accept a finding that a witness's testimony was credible, unless the testimony is incredible or inherently improbable. (*Ibid.*)

### 2. Questions of Law

Questions of law are subject to independent review by this court and a Board decision that rests on an erroneous legal foundation will be set aside. (*Artesia Dairy v. Agricultural Labor Relations Bd.* (2008) 168 Cal.App.4th 598, 605 (*Artesia Dairy*).)

### 3. Statutory Construction

Statutory construction is a specific type of legal question. Generally, the Board's interpretation of the Agricultural Labor Relations Act is given deference because the Board is the administrative agency entrusted with enforcement of the statute. (*Artesia Dairy*, *supra*, 168 Cal.App.4th at p. 605.) Accordingly, courts will follow the Board's interpretation of the statute unless it is clearly erroneous. (*Ibid.*) Nevertheless, a fundamental responsibility of a court construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*J.R. Norton Co. v. Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 29 (*J.R. Norton*); *Bodinson Mfg. Co. v. California E. Com.* (1941) 17 Cal.2d 321, 326 [courts state the true meaning of a statute finally and conclusively].) Thus, while an administrative agency is entitled to deference when interpreting policy in its field of expertise, the agency cannot alter or amend the statute it is interpreting, or enlarge or impair its scope. (*J.R. Norton*, *supra*, at p. 29 [Board's automatic application of make whole remedy misconstrued statute].)

12.

In addition, the Board's leeway in interpreting the Agricultural Labor Relations Act is subject to an express statutory limitation. Section 1148 states that the Board "shall follow applicable precedents of the National Labor Relations Act, as amended."

First, the term "precedent" covers both judicial and administrative decisions. (Gould, *Some Reflections on Contemporary Issues in California Farm Labor* (2017) 50 U.C. Davis L.Rev. 1243, 1245, fn. 5) Thus, "precedent" may be established by the United States Supreme Court, federal appellate courts or the National Labor Relations Board (NLRB). (See *Highland Ranch v. Agricultural Labor Relations Bd*. (1981) 29 Cal.3d 848, 855 [traditionally, the court would "look to established administrative and judicial interpretations of the federal act as persuasive indicants of the appropriate interpretation of the state legislation"].) However, "precedent" does not include any rule of practice or procedure adopted by the federal agency. (*Agricultural Labor Relations Bd. v. Superior Court* (1976) 16 Cal.3d 392, 412.)

Second, as to whether or not a precedent is "applicable" for purposes of section 1148, our Supreme Court has stated that, "under certain circumstances, the board may diverge from federal precedents if the particular problems of labor relations within the agricultural context justify such treatment." (*Triple E Produce Corp. v. Agricultural Labor Relations Bd*. (1983) 35 Cal.3d 42, 48.)

II.     DISCLAIMER OF INTEREST BY THE UNION

     A.     Background

          1.     *Certification of a Labor Organization*

A labor organization that wins an election and is certified by the Board becomes the exclusive bargaining representative of the employees. (§§ 1156, 1156.3.) The two primary consequences of certification are (1) a one-year statutory bar to holding another representation election and (2) the creation of a mutual obligation of the union and the agricultural employer to bargain collectively in good faith. (§§ 1155.2, 1156.5.) In

13.

*Montebello Rose*, this court concluded that the duty to bargain with a certified labor organization does not expire with the initial one-year period because the organization's status as the certified bargaining representative continues after the one-year period expires. (*Montebello Rose*, *supra*, 119 Cal.App.3d at pp. 24-26.)

### 2. Abandonment of the Bargaining Unit

The Board has interpreted the Agricultural Labor Relations Act to mean that once a labor organization is certified as the exclusive bargaining representative of a group of employees, it remains certified "until it is decertified or a rival union is certified, or until the union becomes defunct or disclaims interest in continuing to represent the unit employees." (*Lu-Ette Farms, Inc.* (1982) 8 ALRB No. 91, p. 5.) This principle is referred to as the "certified until decertified" rule and its two exceptions. (*Arnaudo I*, *supra*, 40 ALRB No. 3, p. 9.) The exceptions of defunctness[5] and disclaimer are not expressly stated in the Agricultural Labor Relations Act. Thus, from the perspective of statutory construction, the exceptions were not clearly stated in the text, but were derived by inference.

Both of the exceptions are referred to by the Board under the label "abandonment," which the Board describes as "a legal term of art."[6] (*Bruce Church, Inc.*

---

[5]     Defunctness, which is not an issue in this case, refers to the labor organization's institutional death and inability to represent the employees. (*Arnaudo I*, *supra*, 40 ALRB No. 3, p. 11.)

[6]     The Board uses the phrase "term of art" because the technical definition it gives to "abandonment" is different from the general definition of "abandonment," which states: "The relinquishing of a right to interest with the intention of never reclaiming it…. The act of withdrawing or discontinuing one's help or support, esp. when a duty or responsibility exists." (Black's Law Dict. (10th ed. 2014).) The verb "abandon" means: "**1**. To leave (someone), esp. when doing so amounts to an abdication of responsibility. **2**. To relinquish or give up with the intention of never again reclaiming one's rights or interest in. **3**. To desert or go away from permanently. **4**. To stop (an activity) because there are too many problems and it is impractical or impossible to continue. **5**. To cease having (an idea, attitude, or belief); to give over or surrender utterly." (*Ibid*.)

(1991) 17 ALRB No. 1, p. 9.)  "[T]he Board has defined abandonment as a showing that the Union was either unwilling or unable to represent the bargaining unit." (*Id*. at pp. 9-10.)  More generally, abandonment is, "in essence, a showing that the Union had effectively left the scene altogether." (*Id*. at p. 10.)

These general descriptions of "abandonment" by the Board do not imply that the Board has expanded the circumstances in which a labor organization is deemed to have lost its status as the certified representative of a bargaining unit.  Rather, the Board has "adhered to its holding that defunctness and disclaimer are the only exceptions to the 'certified until decertified' rule." (*Arnaudo I*, *supra*, 40 ALRB No. 3, p. 11.)  Thus, when the Board uses the phrase "'unwilling or unable,'" it means only disclaimer and defunctness. (*Id*. at p. 10, fn. 2.)  For example, in 1996, the Board stated that "stalled negotiations or even a hiatus in negotiations cannot alone be the basis for a refusal to bargain on the grounds that the union is unable or unwilling to represent the unit employees." (*Dole Fresh Fruit Co., Inc.* (1996) 22 ALRB No. 4, p. 11.)  More recently, the Board considered a 13-year lapse in bargaining and concluded that "a period of dormancy of bargaining, even a prolonged period, [does] not establish union 'abandonment' of a certification." (*San Joaquin Tomato Growers, Inc.* (2011) 37 ALRB No. 5, p. 3.)

Although the Board has been consistent in limiting the concept of abandonment by a certified bargaining representative to disclaimer and defunctness, there remains unsettled questions of law about the concept of abandonment and the circumstances in which a labor organization is deemed to have lost its certification.  Part of the uncertainty exists because the concept of abandonment was not *expressed* in the Agricultural Labor Relations Act, but has been recognized by the Board.  The uncertainty surrounding the concept is further demonstrated by the fact that an issue currently pending before the California Supreme Court is whether an employer may oppose a certified union's request for referral to mandatory mediation by asserting the union abandoned the bargaining unit.

(*Gerawan Farming, Inc. v. Agricultural Labor Relations Bd.* (2015) 236 Cal.App.4th 1024, review granted Aug. 19, 2015, S227243.)

>            3.        *Disclaimer of Interest*

In *Arnaudo I*, *supra*, 40 ALRB No. 3, the Board noted that it had "never defined what constitutes a disclaimer of interest" under the Agricultural Labor Relations Act. (*Arnaudo I, supra,* at p. 13.) The Board partially filled the void by adopting four principles derived from precedent of the National Labor Relations Board (NLRB). First, the Board equated a disclaimer with an unwillingness to represent the bargaining unit. (*Id*. at p. 10, fn. 2 and accompanying text.) Second, the Board concluded that a disclaimer by a union must be clear and unequivocal and must be made in good faith. (*Id*. at p. 14.) Third, the union's conduct must not be inconsistent with the disclaimer. (*Ibid*.) Thus, inconsistent conduct can render a clear and unequivocal disclaimer ineffective.[7] (*Ibid*.) Fourth, "the party asserting disclaimer of interest bears the burden of proving the disclaimer occurred." (*Ibid*.)

The foregoing principles are supported by federal court decisions applying the National Labor Relations Act (29 U.S.C. § 151 et seq.). For example, in *Dycus v. N.L.R.B.* (9th Cir. 1980) 615 F.2d 820 (*Dycus*), the court addressed the topic of disclaimers by stating:

> "An exclusive bargaining agent may avoid its statutory duty to bargain on behalf of the unit it represents by unequivocally and in good faith disclaiming further interest in representing the unit. [Citations.] A disclaimer will not be given effect if it is inconsistent with the union's conduct, [citation], nor if it is made for an improper purpose, such as the evasion of the terms and obligations of a collective bargaining agreement, [citation]." (*Id*. at p. 826; see *Corrugated Asbestos Contractors, Inc. v.*

---

[7] The Board provided a further explanation of this principle by quoting an NLRB decision that stated: "'A union's "bare statement" of disclaimer is not sufficient to establish that it has abandoned its claim to representation if the surrounding circumstances justify an inference to the contrary.'" (*Arnaudo I*, *supra*, 40 ALRB No. 3, p. 14.)

*NLRB* (5th Cir. 1972) 458 F.2d 683 [union's written disclaimer of representation of company's sheet metal workers was effective as it was made in good faith; dismissal of company's refusal to bargain charge against union was proper].)

We conclude the four principles set forth in *Arnaudo I* and described above, insofar as they go, are an accurate statement of the law of disclaimer of interest. The principles, however, do not completely define that area of law and, therefore, some uncertainty remains.

B.      Purported Disclaimer of Interest by the Union Was Not Unequivocal

        1.      *Grower's Contentions*

Grower contends the Board erred when it decided there had been no express disclaimer of interest by the Union. Grower argues the administrative law judge committed legal error because (1) his reasoning was contrary to NLRB precedent, (2) he ignored part of the test for determining the existence of a disclaimer of interest, and (3) he rejected Grower's defense after misconstruing it as being based on the passage of time rather than statements by a representative of the Union. Grower also contends applicable NLRB precedent is consistent with a finding of an express disclaimer by the Union because, in Grower's view, the Union has engaged in conduct consistent with a disclaimer of interest in representing the employees.

Grower responded to arguments that its claims of error misapplied the burden of proof, and the substantial evidence standard of review by arguing the Board's conclusion that the Union did not make an effective disclaimer of interest was not supported by substantial evidence. Also, Grower reiterated its argument that NLRB precedent is consistent with the fact that the Union unequivocally disclaimed interest in representing Grower's employees.

Grower has raised a number of points. Our analysis of those points begins with whether Grower carried its burden of proving there was an unequivocal disclaimer of

17.

interest.  We start there because some of Grower's claims of legal error are based on there being an unequivocal disclaimer.

### 2.    *The Union Representative's Oral Statements*

Grower's contention that the Union unequivocally disclaimed interest in representing Grower's employees is based on the testimony of Steve Arnaudo about what was said at the last bargaining sessions held in the 1980's.[8]  His testimony was presented in the following exchange.

"Q.    Now I'm asking you specifically, what did the union negotiator say to you?  What words?

"A.    I recall these very vividly because they meant so much to me.

"Q.    Okay.

"A.    He says, 'You don't like unions, do you?'  I says, 'Yeah, I'm okay with unions.  I just don't like particularly your union – which was the [United Farm Workers] at this time – I says 'So I have no problem with unions, except you.'

"Q.    Okay.  And did he have any response to that statement by you?

"A.    Yeah, he says, I – 'We don't like you either.  We're through with you.'

"Q.    And did you respond back to that statement by the union –

"A.    I said, 'Well, great, so I'm over with you.'"

---

[8]    The date of the last session is uncertain.  In response to leading questions from counsel, Arnaudo testified the last session occurred in October 1981.  In contrast, the declaration he submitted to support the motion for summary judgment identified the last session as occurring in May 1982.  Arnaudo's declaration stated he participated in dozens of face-to-face meetings through May 1982 and:  "At what turned out to be the parties' final meeting in May of 1982, the [Union's] lead negotiator, Mac Lyons, told me that the Union 'no longer wanted anything to do with the Company,' or words substantially to that effect, and the negotiations came to a halt."  For purposes of this proceeding, we need not describe how Arnaudo's testimony conflicts with the testimony and declarations of other witnesses.

Without determining whether this exchange actually took place, the administrative law judge assumed the foregoing testimony accurately recounted the statements made by the Union representative and addressed whether the statement "We're through with you" constituted a clear and unequivocal disclaimer of interest. The administrative law judge determined the statement, if made, was not a clear and unequivocal disclaimer of interest in representing Grower's employees:

> "First of all, it is unclear whether the statement referred to Arnaudo personally, or [the] business entities. Secondly, the statement said nothing about not representing the employees. More likely, the statement, if made, simply reflected the frustration of bargaining for four or five years, without being able to obtain the economic provisions the [Union] was seeking."

### 3. Meaning of "Unequivocal"

In *Arnaudo I*, *supra*, 40 ALRB No. 3, the Board explicitly adopted NLRB precedent as the standard for what constitutes an effective disclaimer of interest and required the disclaimer to be clear and unequivocal. However, the Board has not defined what the terms "clear" and "unequivocal" mean. Consequently, before we apply the standard to the facts of this case, we define the meaning of "clear and unequivocal."

A dictionary defines "unequivocal" to mean "leaving no doubt" and lists "clear" and "unambiguous" as synonyms. (Merriam Webster's Collegiate Dict. (10th ed. 1999) 1290.) We will not use the phrase "leaving no doubt" to define clear and unequivocal because its use of the word "doubt" might cause it to be equated with the "beyond a reasonable doubt" burden of proof. Consequently, we conclude "clear and unequivocal" means unambiguous. The common or ordinary definition of "ambiguous" is "capable of being understood in two or more possible senses or ways." (Merriam Webster's Collegiate Dict., *supra*, p. 36.) This definition is consistent with the well-established legal definition, which states that "ambiguous" refers to language that is susceptible to more than one reasonable interpretation. (*Merced Irrigation Dist. v. Superior Court*

19.

(2017) 7 Cal.App.5th 916, 925.) Therefore, we conclude that "unequivocal" means susceptible to only one reasonable interpretation.

### 4. Question of Law or Fact?

Here, Grower has argued the determination that the purported disclaimer was not unequivocal is erroneous because it is not supported by substantial evidence. This argument implies that the existence of an unequivocal disclaimer presents a question of fact. We need not resolve whether the existence of an unequivocal waiver is a question of fact or a question of law. The outcome in this case is the same regardless of how the question is categorized. Under an independent or a substantial evidence standard of review, the statements Grower contends constituted a disclaimer of interest are ambiguous.

### 5. Ambiguity of the Word "You"

The pronoun "you" was used in the Union representative's statements "We don't like you either" and "We're through with you." Therefore, we consider whether the use of "you" in these statements rendered them ambiguous. "You" is defined as "the one or ones being addressed — used as the pronoun of the second person singular or plural in any grammatical relation except that of a possessive." (Merriam Webster's Collegiate Dict., *supra*, p. 1374.)

To simplify matters in a way that is not harmful to Grower, we assume "you" had the same meaning in both of the Union representative's statements. Under the evidence presented, there are at least five possible interpretations of "you"—two of which are singular and three of which are plural.[9] First, "you" could have referred solely to Steve Arnaudo as an individual. Second, "you" could have been used to mean only Grower, the entity represented by Steve Arnaudo. Third, "you" could have meant the two individuals

---

[9] The meaning of the terms "you're" and "you" used in two picket signs was "ambiguous because the pronoun 'you' can be used to indicate either the second person singular or plural form." (*Snyder v. Phelps* (4th Cir. 2009) 580 F.3d 206, 224.)

20.

representing Grower at that particular bargaining session—namely, Steve Arnaudo and Grower's attorney, Dante Nomellini. Fourth, "you" could have been used to include Grower and Steve Arnaudo as an individual. Fifth, "you" could have been used broadly to encompass Grower, Steve Arnaudo and Nomellini.

The five possibilities that arise under the evidence presented support the finding that the use of the term "you" caused the statement "We're through with you" to be ambiguous. Stated another way, the words are reasonably susceptible to more than one interpretation when the only evidence considered relates to the persons present for the negotiation session and the entities they represented.

### 6. *Role of Surrounding Circumstances*

The parties agree that surrounding circumstances have a role in determining whether the words used were unequivocal. On the matter of timing, they disagree about whether the relevant circumstances include matters that happened *after* the purported disclaimer was made.

In accordance with the parties' agreement, we will evaluate the circumstances that existed at the time when the words purporting to be the disclaimer were spoken in determining whether an unequivocal disclaimer was made. This evaluation is similar to that made by the administrative law judge, which considered these circumstances and whether they pointed to a particular meaning of the word "you." As to the role of circumstances and events arising *after* the purported disclaimer was made (which include the 30 years of Union inactivity), we address that role in part II.D, *post*.

### 7. *Effect of Surrounding Circumstances on Ambiguity*

Grower contends "the statement of the Union representative to Steve Arnaudo should not have been ignored as ambiguous as to whom 'you' is referring to. Both individuals in the discussion were representatives of the entities participating in negotiations. 'You' obviously referred to Petitioners, as entities or parties to the

21.

negotiations. Otherwise, the statement would have no meaning whatsoever." We do not agree that the meaning of "you" is obvious. Rather, the statement is capable of various meanings depending upon how "you" is interpreted. Furthermore, substantial evidence supports a finding that multiple meanings are reasonably possible under the circumstances.

The fact that the statement was made during a bargaining session between the Union and Grower is a surrounding circumstance relevant to determining whether the statement was ambiguous or unequivocal. However, a more specific aspect of the circumstances surrounding the Union representative's statement is the conversation immediately preceding the statement. That conversation sets the stage for the Union representative's statement "We're through with you." The subject being discussed was Steve Arnaudo's *personal* feelings towards unions in general and towards the United Farm Workers of America in particular. Steve Arnaudo stated he had no problems with unions, except the United Farm Workers of America. The Union representative then mirrored this statement by replying, "We don't like you either." The use of the words "like" and "either" supports the factual inference that the statement responded directly to Steve Arnaudo's statement that "I just don't like particularly your union." In this context, it is reasonable to interpret "you" in the statement "We don't like you either" to refer to Steve Arnaudo as an individual and not his business, which is an entity that does not experience feelings? Furthermore, it is reasonable to infer the Union representative used "you" in the same sense when he continued speaking and said, "We're through with you." Thus, a trier of fact could reasonably interpret the representative's expression of dislike as relating to Steve Arnaudo personally and his statement "We're through with you" also as referring to Steve Arnaudo personally.**10**

---

**10**    The following is a reasonable possibility for the Union representative's underlying thought process: "You, Steve Arnaudo, have just admitted to being biased against the Union, which I presently interpret as meaning further negotiations with you as Grower's

22.

Therefore, we conclude the circumstances surrounding the statement "We're through with you" support the finding that the term "you" was ambiguous, not unequivocal. The representative could have meant "you" to refer to either Steve Arnaudo personally or to Grower. Consequently, the evidence supports the finding that the Union representative's statements were not an unequivocal disclaimer of interest in representing Grower's employees.

### 8. Other Potential Ambiguities

In view of the ambiguity of "you," we need not analyze whether the pronoun "we" created a further ambiguity in the statements. "We" is a first person plural pronoun that means "I and the rest of a group that includes me." (Merriam Webster's Collegiate Dict., *supra,* p. 1338.) In this context of the last bargaining session in the 1980's, "we" could be interpreted to refer to the feelings of the two Union negotiators as individuals. Alternatively, "we" could be interpreted more broadly to include the individual negotiators and the Union, as a group. Adopting the former interpretation would mean those individuals (not the Union) were "through with" Steve Arnaudo or Grower.

Similarly, we need not analyze whether the phrase "through with" is ambiguous. The administrative law judge implied the phrase was not unequivocal when he stated that

representative are pointless. Therefore, I intended to recommend the Union (1) cease bargaining with you, Steve Arnaudo, and (2) continue to represent the employees in the bargaining unit by pursuing charges against Grower for unfair labor practices. It is my present intention that after those charges are resolved, the Union will resume negotiations, hopefully with someone other than you representing Grower."

The prospect of the Union pursuing charges was addressed by the administrative law judge. He stated that Nomellini acknowledged that, after October 1981 (the date given by Nomellini as when negotiations ended), the Union alleged unfair labor practices by Grower that did not involve bad faith bargaining. However, the administrative law judge explicitly stated it was unnecessary for him to determine whether the Union pursued unfair labor practice allegations involving Grower *or* requested additional bargaining prior to 2012 because mere inactivity does not amount to a disclaimer and the purported disclaimer was not unequivocal.

the Union representative's statement "said nothing about not representing the employees." The statement suggests that being "through with you" is not necessarily the same as being "through with" representing the employees in the bargaining unit.

### 9. Comparison to NLRB Decisions

As a test of whether our conclusion that the phrase "We're through with you" is ambiguous, we compare that result with the conclusions reached in NLRB decisions addressing the existence of a disclaimer.

We begin with *Miratti's Inc.* (1961) 132 NLRB 699 because it is a case where oral statements resulted in the NLRB finding a disclaimer had been made. (*Id.* at p. 701.) In that case, the union's recently appointed secretary-treasurer told the employer on July 25, 1960, that the union felt obligated to picket the employer and inform the general public that the employer did not have a union contract, but he did not want any misconceived ideas that the union was asking for a contract or claiming to represent the employees in any shape, way or form. (*Id.* at p. 700.) Part of the reason the union felt obligated to picket was that signs still hung in the employer's stores stating it had a union contract and union members were patronizing the stores in the belief the employer had a union contract. (*Ibid.*) On August 8, 1960, the union began picketing with signs stating the employer did not have a contract with a retail clerks' union. (*Id.* at p. 701.) At a subsequent hearing, "the Union again disclaimed any interest in representing the Employer's employees." (*Ibid.*)

The NLRB found the union's disclaimer was an effective one, stating: "In this case, the Union, once having disclaimed in unmistakable terms, engaged in no action inconsistent therewith. Its picketing is accounted for by uncontradicted testimony which shows that it had no recognitional objective. At the hearing, the Union repeated its disclaimer." (*Miratti's Inc.*, *supra*, 132 NLRB at p. 701.) The union's oral statements in *Miratti's Inc.* are easily distinguished from the statements the administrative law judge

24.

assumed the union representative made to Steve Arnaudo. The secretary-treasurer's statements addressed the union's position from two perspectives. First, it was stated that the union was not asking to represent the employees "'in any shape, way or form.'" (*Ibid.*) Second, the secretary-treasurer reiterated that point by stating the union's only interest was to advertise the fact that the employer had no contract with the union. Furthermore, the disclaimer was repeated in a formal setting. In contrast, the statement "We're through with you" does not explicitly address the role of the union in representing the employees, does not describe a limited purpose of future actions (i.e., picketing) the union intends to take, and was not repeated in a formal proceeding.

The case of *Vaughan & Sons, Inc.* (1986) 281 NLRB 1082 involved oral statements by a union business agent to a first-line supervisor of the employer. The supervisor testified the business agent said he "'had just come by to tell me that he enjoyed working with me, and he probably wouldn't see me again. He said we were pulling out.'" (*Id.* at p. 1084.) The administrative law judge found the union business agent's oral statement, "particularly when considered in light of other events which were then taking place between [the employer] and the Union, falls far short of being clear and unequivocal. I find that the Union did not disclaim or waive its right to bargain on behalf of unit employees." (*Ibid.*) The "other events" included subsequent conduct that was inconsistent with the purported disclaimer. Like the language at issue in the present case, the statement "we were pulling out" does not mention representation of the employees. Consequently, it is distinguishable from the detailed statement addressing representation made in *Miratti's Inc*.

In *Conkle Funeral Home, Inc.* (1983) 266 NLRB 295, the employees were dissatisfied with the contract negotiated by the union and refused to ratify the contract. (*Id.* at p. 296.) After discussions between employees and union officials, the union official decided to accommodate the employee's wishes and disclaim the union's interest

25.

in representing the employees.  (*Ibid*.)  In a letter to all five of the bargaining unit employees, which was copied to the employer, the union stated:

> "Pursuant to our many phone conversations and after much soul searching on the part of this Local Union, please be advised effective this date Teamsters Local Union No. 193 no longer desires to represent the unit certified by the N.L.R.B. November 4, 1980 in case #25-RC-7534.  [¶]  I feel that this Local Union has done all that is possible to be done in securing a Collective Bargaining Agreement and that any further negotiations would be fruitless because of your unreasonably high demands."  (*Ibid*.)

This letter, like the detailed statement made in *Miratti's Inc*., explicitly addresses representation of the employee and clearly states the union is relinquishing the right to continue representing the employees.

In sum, our conclusion that the statement "We're through with you" is ambiguous is consistent with the NLRB decisions addressing the existence of an unequivocal disclaimer.

### D.        Relationship to the Purported Disclaimer

The parties disagree how conduct subsequent to the purported disclaimer fits into the analysis of whether an effective disclaimer of interest was made.  Grower contends that subsequent conduct *consistent with* the disclaimer, such as the Union's 30 years of inactivity before it contacted Grower in August 2012, is evidence that must be weighed in determining whether there was an effective disclaimer of interest.  The administrative law judge disagreed, stating subsequent conduct is considered only after a clear and unequivocal disclaimer has been established and then inconsistent conduct can be used to establish the disclaimer is not effective.  He gave little consideration to subsequent conduct because he determined the purported disclaimer was not clear.

We conclude that the Board did not commit legal error in its treatment of the subsequent conduct of the Union.  Under applicable federal precedent, an unequivocal "disclaimer will not be given effect if it is inconsistent with the union's conduct."

(*Dycus*, *supra*, 615 F.2d at p. 826.) Grower inverts this principle and construes it to mean that an ambiguous disclaimer will be given effect if the union's subsequent conduct is consistent with a disclaimer of interest. Grower's view has not been adopted in federal precedent. Instead, federal precedent is limited to using inconsistent conduct to negate the existence of a disclaimer. (See *Ibid*.) Therefore, we conclude the Board properly applied existing precedent when it concluded that (1) subsequent inconsistent behavior renders an unequivocal disclaimer ineffective, but (2) subsequent consistent behavior does not convert an ambiguous disclaimer into an effective disclaimer.

Grower relies on *Vaughan & Sons, Inc.*, *supra*, 281 NLRB 1082, a case where the employer contended a statement by the union business agent that "we were pulling out" was a disclaimer of interest. (*Id*. at p. 1084.) The NLRB considered the statement in light of the other events that were taking place between the employer and the union and concluded the statement fell short of being clear and unequivocal disclaimer. (*Ibid*.) The NLRB rejected the employer's argument that the union's actions after the statement were consistent with a disclaimer as "patently absurd." (*Ibid*.) The subsequent conduct included a request by the union's counsel for information from the employer, a request that was confirmed in the employer's providing that information. (*Ibid*.) That request for information by the union was inconsistent with a disclaimer of interest in representing the bargaining unit. As a result, *Vaughan & Sons, Inc.* does not establish the principle that subsequent conduct *consistent with* a disclaimer is evidence relevant to deciding whether the alleged disclaimer was clear and unequivocal. Therefore, the Board's determination that subsequent conduct is relevant only to show an unequivocal disclaimer of interest is not effective does not contradict *Vaughan & Sons, Inc.* and accurately adheres to the principle about inconsistent conduct stated in *Dycus*, *supra*, 615 F.2d at page 826.

III.    MAKE WHOLE RELIEF

    A.    Overview

        1.    *Statutory Text and Purpose*

Section 1160.3 provides that when the Board determines a person has engaged in an unfair labor practice, it "shall issue … an order requiring such person [1] to cease and desist from such unfair labor practice, [2] to take affirmative action, including reinstatement of employees with or without backpay, and *making employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain*, and [3] to provide such other relief as will effectuate the policies of [the Agricultural Labor Relations Act.]"  (Italics added.)

The purpose of the make whole remedy is to put the parties and the employees in the economic positions that they presumably would have occupied if the employer had not unlawfully refused to bargain.  (*F & P Growers Assn. v. Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 667, 682 (*F & P Growers*).)  In other words, make whole relief compensates the employees for losses incurred as a result of the delays in the collective bargaining process.  (See *J.R. Norton*, *supra*, 26 Cal.3d at pp. 27, 36.)

        2.    *Standard for Exercising Discretion*

The phrase "when the board deems such relief appropriate" in section 1160.3 clearly demonstrates that make whole relief is discretionary in nature.  (*J.R. Norton*, *supra*, 26 Cal.3d at pp. 37-38; *F & P Growers*, *supra*, 168 Cal.App.3d at pp. 680-682.)  In exercising that discretion, the Board must consider the facts and equities of each particular case and may not automatically impose make whole relief for every refusal to bargain.  (*J.R. Norton*, *supra*, at pp. 37–38.)

The particular standard for deciding when make whole relief is appropriate was identified by the court in *F & P Growers* by quoting the following statement by the Board:

"'[W]e consider on a case-by-case basis the extent to which the public interest in the employer's position weighs against the harm done to the employees by its refusal to bargain. Unless litigation of the employer's position furthers the policies and purposes of the act, the employer, not the employees, should ultimately bear the financial risk of its choice to litigate rather than bargain.'" (*F & P Growers*, *supra*, 168 Cal.App.3d at p. 682.)

Where the record demonstrates the Board did examine the facts and circumstances of the particular case and did not impose the make whole remedy automatically, the Board's order will be reviewed for an abuse of discretion. (*F & P Growers*, *supra*, 168 Cal.App.3d at p. 682.)

B.     Decision to Impose Make Whole Relief

The April 2015 supplemental decision of the administrative law judge quoted language used in *J.R. Norton* and *F & P Growers*. Thus, the supplemental decision demonstrates he was aware of the legal standards governing make whole relief. Therefore, this is not a case where the administrative law judge or the Board committed legal error by automatically imposing make whole relief or otherwise failing to apply the correct legal standard.

The administrative law judge explicitly applied the standard from *F & P Growers* and considered whether the public interest in Grower's disclaimer defense outweighed the harm done to the employees by the refusal to bargain. The administrative law judge concluded the test for establishing a disclaimer of interest was relatively well settled, which reduced the public interest in Grower's pursuit of that issue. Based on section 1148 and the administrative law judge's perception that Grower presented no arguments as to why the federal precedents on the disclaimer issue were inapplicable, the administrative law judge concluded the public interest in the disclaimer issue litigated by Grower was outweighed by the employees' interest in collective bargaining.

The administrative law judge awarded make whole relief and determined the award should cover the period from September 27, 2012, until May 24, 2013, approximately eight months. The starting date was when Carrol (1) ignored the Union's

requests for information and bargaining and (2) raised some "preliminary questions," including challenges to the Union's representative status.  The closing date of the make whole period was when the first mandatory mediation session took place.

A majority of the Board voted to affirm the administrative law judge's ruling, findings and conclusion in full.  (*Arnaudo II*, *supra*, 41 ARLB No. 6, p. 2.)  The majority also adopted the administrative law judge's recommended order, including the award of make whole relief.  (*Ibid*.)  The concurring and dissenting opinion set forth additional reasons for granting make whole relief.

C.      Applying the Standard for Awarding Make Whole Relief

1.      *The Parties' Contentions*

Grower contends the Board erred by concluding that make whole relief was appropriate in the circumstances of this case.  First, Grower contends the administrative law judge's reliance on *Tri-Fanucchi Farms* (2014) 40 ALRB No. 4 is suspect because that decision currently is under review by the California Supreme Court.  (*Tri-Fanucchi Farms* (2015) 236 Cal.App.4th 1079, review granted Aug. 19, 2015, S227270.)  Second, Grower contends federal precedent supported its position as to the existence of an effective disclaimer and sufficient uncertainty existed on how the disclaimer issue would be resolved under the Agricultural Labor Relations Act that litigation of the issue served the public interest.  Noting the Union's 30 years of inactivity, Grower argued: "Contesting the Employer's obligation to bargain in such a situation and demanding judicial review of the Board's decision cannot be said to be unreasonable considering the facts and the important legal issue presented."

The Board counters by arguing make whole relief was proper because it appropriately concluded Grower, and not its employees, should bear the financial risk of its decision to litigate the application of settled NLRB precedent.  The Board contends the reasonableness or good faith of Grower's litigation position does not control the

decision to award make whole relief.  In Board's view, "the employees' interest in collective bargaining after the [Union] requested negotiations was not outweighed by [Grower's] interest in litigating its claim."

## 2. *Identification of Public Interest*

The standard approved in *F & P Growers* requires a weighing of the public interest in the employer's position against the harm done to the employees by the refusal to bargain.  (*F & P Growers*, *supra*, 168 Cal.App.3d at p. 682.)  The public interest in the employer's position is defined by whether litigation of that position furthers the policies and purposes of the Agricultural Labor Relations Act.  (*Ibid.*)  Our identification of the policies and purposes of the act is straightforward because of the Legislature's statements in section 1140.2:

> "It is hereby stated to be the policy of the State of California to encourage and protect the right of agricultural employees to *full freedom* of association, self-organization, and designation of *representatives of their own choosing*, to negotiate the terms and conditions of their employment, and to be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.  For this purpose this part is adopted to provide for collective-bargaining rights for agricultural employees."  (Italics added.)

The reference to rights in the last sentence of section 1140.2 leads us to section 1152, which enumerates the rights of agricultural employees as follows:

> "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through *representatives of their own choosing*, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and *shall also have the right to refrain from any or all of such activities* except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of continued employment as authorized in subdivision (c) of Section 1153."  (Italics added.)

31.

The statutory references to employees' "full freedom of association" and "representatives of their own choosing" along with the right "to refrain from any or all such activities" demonstrate a core value underlying the Agricultural Labor Relations Act is the individual employee's right to choose. (§§ 1140.2, 1152.) Freedom of association and choice is more fundamental than the right to bargain collectively because the right to bargain collectively is exercised *after employees have chosen* to bargain collectively, rather than choosing to refrain from such activity.

A central feature promoting the policy is elections by secret ballot to determine issues of employee representation by a labor organization. (§§ 1156, 1156.3; see *J.R. Norton*, *supra*, 26 Cal.3d at p. 8.) The secret ballot protects an employee's freedom of choice and the right to vote for or against representation by a labor organization. If the freedom is to be "full," whatever choice was made must be given equal dignity in the eyes of the law. More fundamentally, the freedom of choice means little where the individual employees in question never actually made a choice.

### 3. *Analysis of Public Interest in Grower's Litigation Position*

Our next step considers how Grower's litigation position relates to California's policy of providing employees the freedom to choose whether or not to be represented by a labor organization in collective bargaining. A basic factual question presented in cases of long periods of inactivity by the labor organization is whether the current employees of Grower—that is, the employees who actually will experience the impacts of the Union's renewed activity—ever chose to have the Union act on their behalf.

The Board and the administrative law judge simply ignored this basic factual question and how it relates to the policy of protecting employees' right to freely choose—the core right clearly expressed in sections 1140.2 and 1152. The Board's approach to the certified until decertified rule, for all practical purposes, is the equivalent of a legal fiction that the employee vote taken over 40 years ago (before the January 2017

32.

certification of the Union) constitutes the free choice of Grower's current employees and, therefore, the Union is the representative "of their own choosing" for purposes of sections 1140.2 and 1152. This legal fiction exists because the analysis stated by the administrative law judge and adopted by the Board gave no consideration to the right of freedom of choice of Grower's current employees and whether a certified labor organization's return after a long period of inactivity forced those employees to accept representation that they did not choose.

The factual questions of whether Grower's current employees have chosen (or would choose) collectively bargaining and, if so, whether they have chosen (or would choose) the Union to be their representative cannot be resolved on the record before this court. The record contains no evidence to support a finding of fact that a single employee who voted for the Union in the 1970's was still working for Grower when the Union initiated negotiations in April 2012. We note that the July 2013 declaration of Carrol makes the factual assertion "that none of the present-day workers had voted in the original representation election or, in some cases, were even alive … when the [Union] was certified as the exclusive bargaining representative." We do not regard this declaration resolving the question. Carrol's declaration asserts he had personal knowledge of the matters set forth in the declaration and, if called as a witness, he could competently testify to the matters. However, the declaration provides no foundational facts showing Carrol had personal knowledge of (1) the identity of each present-day worker and (2) whether that worker participated in the election held before January 1977. Indeed, the statement that "I am informed and believe and thereon allege that at its peak, [Grower] employs roughly 130 to 150 farm workers" strongly supports the inference that he did not know the identity of Grower's current workers and, thus, cannot know whether or not those individuals voted in the election.

Similarly, the record contains no evidence that any current employees began working for Grower *during the period that the Union was actively negotiating* with

Grower. Nonvoting employees in this category might be regarded as having exercised their right to choose simply by voluntarily accepting employment in a bargaining unit that had a certified representative actively negotiating with the employer. Indeed, it is possible that a worker who started at that time actually relied on the Union engaging in collective bargaining on his or her behalf in accepting employment. The factual question of actual reliance was not addressed by the administrative law judge or the Board.

Another aspect of this particular case that relates to the actual choice of Grower's current employees is the decertification petition and how the Board handled that petition. The blocking of the decertification election, even if appropriate under the legal standards applied to decertification petitions, foreclosed an opportunity for the individuals currently employed by Grower to exercise their freedom of choice by casting a secret ballot in an election.[11]

Besides the factual questions involving freedom of choice, a rule of law that permits long periods of inactivity by the labor organization—that is, periods where the certified labor organization does not act upon its statutory obligations to the bargaining unit—is antithetical to the statutory policies of actual representation by the elected union and promoting the collective bargaining relationship. (See generally, §§ 1140.2, 1152, 1155.2, subd. (a).) In short, an unexplained or unjustified inactive certified labor organization does not provide employees with representation or further collective bargaining.

Based on the facts and equities particular to this case, we conclude the Board's approach to long periods of union inactivity undermined, rather than protected or promoted, some of the policies underlying the Agricultural Labor Relations Act. In

---

[11] Carrol's declaration asserted that 88 of approximately 130 employees signed a document favoring decertification and claims, by implication, that this is the only evidence as to how the current group of employees would exercise their right to choose. Grower's motion for summary judgment asserted 86 employees signed the document.

34.

contrast, the Grower's position on the disclaimer issue would have provided some protection to the right of employees to choose (1) whether or not to engage in collective bargaining and (2) which labor organization would conduct that bargaining on their behalf. Simply stated, the Union has limited the rights of the current group of employees to refrain from collective bargaining, or their right to choose who represents them, without regard for their freedom of association.

Based on the foregoing, we conclude that "litigation of the employer's position further[ed] the policies and purposes of the act" for purposes of the standard approved in *F & P Growers*, *supra*, 168 Cal.App.3d at page 682. Consequently, we further conclude that the Board erred by ignoring the effect of a long absence by the Union on the employees' right to freedom of choice, which resulted in this important policy consideration being erroneously excluded from the weighing process required by the standard approved in *F & P Growers*.

Another aspect of whether Grower's litigation position furthered the public interest is whether the issue being pursued was unsettled and, therefore, a judicial resolution of that issue would benefit the public by increasing the certainty in the rules applicable to agricultural labor. Here, each side has contended federal precedent supported its view. These positions, adopted by zealous advocates, do not accurately describe the state of the law as it pertains to the issues associated with long periods of inactivity by a certified labor organization. As explained below, we conclude the law was uncertain on this particular topic and the parties' attempts to apply general principles to the particular issues raised in this case is the equivalent of painting with too broad a brush.

First, as of the writing of this opinion, issues relating to abandonment of a certification by a long-absent union currently are pending before the California Supreme Court. The uncertainty relating to these issues existed when the Board and administrative law judge were issuing their decisions in this case, as is evidenced in part by the fact a

35.

supplemental decision was required after the Board explicitly decided the standard for what constitutes an effective disclaimer of interest under the Agricultural Labor Relations Act.

Second, the parties have pointed to no specific judicial precedent that *explicitly* considers whether a long period of inactivity could be used to clarify an ambiguous disclaimer, which is the question presented in this case. Lacking precedent directly on point, it is logical to look to other areas of law and reason by analogy. For instance, in contract law, "[a] party's conduct occurring between execution of the contract and a dispute about the meaning of the contract's terms may reveal what the parties understood and intended those terms to mean." (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 393; *In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 52 [course of performance evidence is entitled to great weight in resolving dispute about meaning of a contract].) Under this principle, it was logical to argue that the post-statement conduct of the Union was relevant to determining meaning of the Union representative's ambiguous oral statements.

Therefore, we conclude the disclaimer issues presented in this case were far from settled. Consequently, judicial review of those issues are helpful to the public and all parties concerned because it will clarify (or subsequent review of this decision will clarify) the law. Consequently, Grower's advancement of this litigation plainly furthered the broader statutory purposes by promoting greater stability in labor relations by obtaining an appellate decision on this important issue. Accordingly, we conclude the Board erred when it ordered make whole relief in this case, and that portion of the Board's order is subject to reversal.[12]

---

[12] Based on this conclusion, we need not address Grower's alternate legal theory that the Board erred in awarding make whole relief when mandatory mediation was underway.

## DISPOSITION

The petition is granted in part and denied in part.  The Board's remand order in *Arnaudo I* (2014) 40 ALRB No. 3 is affirmed.  The Board's order in *Arnaudo II* (2015) 41 ALRB No. 6 is reversed and set aside insofar as it imposed make whole relief.  The balance of that order is affirmed.

Each party to this original writ proceeding shall bear its own costs.  (Cal. Rules of Court, rule 8.493(a)(1)(B).)

_____
FRANSON, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
DETJEN, J.